1
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3    UNITED STATES OF AMERICA,

4           Plaintiff,

5        -v-                        Case No. 15-20774

6    KEITH COLLIER,

7  _____ Defendant./

8                   **ARRAIGNMENT ON INDICTMENT**
                        **DETENTION HEARING**
9              **BEFORE HON. ELIZABETH A. STAFFORD**
                    United States Magistrate Judge
10            Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
11                    Detroit, Michigan 48226

12                **(Wednesday, December 23, 2015)**

13   APPEARANCES:        ANDREW LIEVENSE, ESQUIRE
                         Appearing on behalf of the Government.
14
                         BERTRAM JOHNSON, ESQUIRE
15                       Appearing on behalf of the Defendant.

16   TRANSCRIBED BY:     MARIE METCALF, CVR, CM
                         Federal Official Court Reporter
17                       257 U.S. Courthouse
                         231 W. Lafayette Boulevard
18                       Detroit, Michigan 48226
                         metcalf_court@msn.com
19

20

21         **(TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING;**
               **TRANSCRIBER NOT PRESENT AT PROCEEDINGS)**
22

23

24

25

1                          **TABLE OF CONTENTS**

2

3        Proceedings – Wednesday, December 23, 2015

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*U.S.A. v. Keith Collier*

1          Detroit, Michigan

2          Wednesday, December 23, 2015

3          At 1:42 p.m.

4                          *   *   *

5          DEPUTY COURT CLERK:  The Court calls case number

6    15-20774, United States of America versus Keith Collier.

7          MR. LIEVENSE:  Good afternoon, Your Honor.  Andrew

8    Lievense on behalf of the United States.

9          This is the date and time set for the completion of

10   Mr. Collier's arraignment, as well as a detention hearing in

11   this matter.

12         THE COURT:  Okay.

13         MR. JOHNSON:  Good afternoon, Your Honor.  May it

14   please the Court, Bertram Johnson appearing on behalf of

15   Keith Collier, and that is correct, Judge.  We are ready to

16   proceed.

17         THE COURT:  Okay.

18         First of all, for the arraignment due, you have the

19   acknowledgment?

20         MR. JOHNSON:  Yes, Judge.  We acknowledge receipt of

21   the indictment.  I thought that was taken care of the last

22   proceeding.  But we do acknowledge receipt of the indictment.

23         THE COURT:  Well, I need the acknowledgments --

24         MR. JOHNSON:  Judge, I thought that was taken care

25   of the last time we were here.  Someone substituted for me.

*U.S.A. v. Keith Collier*

1       MR. LIEVENSE:  Yeah.  Last week, Your Honor, someone

2    was filling in for Mr. Johnson.  And I did provide him with

3    additional copies today, but that may be why --

4       THE COURT:  Ms. Williams, there aren't any

5    acknowledgments in the record.

6       DEPUTY COURT CLERK:  I'll double check, but I don't

7    recall.

8       MR. LIEVENSE:  I don't believe it was entered last

9    week.

10      DEPUTY COURT CLERK:  No, there's nothing in there.

11      THE COURT:  Okay.  Do you have any copies?

12      MR. JOHNSON:  Yeah.

13      DEPUTY COURT CLERK:  Mr. Collier needs to sign this.

14   Thank you.

15      THE COURT:  Okay.  You're Keith Collier?

16      DEFENDANT COLLIER:  Yes, I am.

17      THE COURT:  You have the right to remain silent.

18   Anything you say may be used against you.

19      Mr. Collier, have you had an opportunity to review

20   the indictment?

21      DEFENDANT COLLIER:  Yes, I have.

22      THE COURT:  And did you go over it with Mr. Johnson?

23      DEFENDANT COLLIER:  Yes, I did.

24      THE COURT:  And you understand the nature of the

25   charges against you?

*U.S.A. v. Keith Collier*

1          DEFENDANT COLLIER:  Yes.

2          THE COURT:  And do you understand that if you are

3   found guilty or plead guilty to Count One of the indictment

4   that you face up to ten years of imprisonment, and a fine of

5   $250,000 or both?

6          DEFENDANT COLLIER:  Yes.

7          THE COURT:  You understand that if you are found

8   guilty or plead guilty to Counts Two and Three, or Two or

9   Three, for each one you face five to forty years of

10  imprisonment, a fine of up to $5 million or both?

11         DEFENDANT COLLIER:  Yes, Your Honor.

12         THE COURT:  For Count Four, you understand that you

13  face five years to life of imprisonment consecutive to any

14  other sentence and a fine of up to $250,000?

15         DEFENDANT COLLIER:  Yes, Your Honor.

16         THE COURT:  And finally, with respect to Count Five,

17  you understand that you face up to ten years of imprisonment

18  and a fine of $250,000 or both?

19         DEFENDANT COLLIER:  Yes.

20         THE COURT:  Mr. Johnson, does your client stand mute

21  and waive all the reading?

22         MR. JOHNSON:  Judge, he stands mute and waives the

23  formal reading of the indictment, and pleads not guilty on

24  all charges contained herein.

25         THE COURT:  All right.  I'll enter a plea of not

*U.S.A. v. Keith Collier*

1    guilty.

2            So now we can deal with the -- this is the detention

3    hearing going forward?

4            MR. LIEVENSE:  Yes, Your Honor.

5            THE COURT:  May I have a moment to read the pretrial

6    services report?

7            MR. LIEVENSE:  Your Honor, if I may, I also intended

8    to provide some exhibits.  I don't know if you want them now

9    to review them or later, but --

10            THE COURT:  Have you provided copies to Mr. Johnson?

11            MR. LIEVENSE:  Yes.

12            MR. JOHNSON:  The defense is in receipt thereof.

13            THE COURT:  All right.  Thank you.

14            All right.

15            (Brief pause in proceedings)

16            THE COURT:  All right, you may proceed.

17            MR. LIEVENSE:  Your Honor, for the record, I would

18    like to note that I provided the detention motion worksheet

19    to the Court and also provided a copy to the defense counsel.

20            The government does intend to proceed --

21            THE COURT:  I don't see that.  Here it is.  Okay.

22    One moment, please.

23            (Brief pause in proceedings)

24            THE COURT:  Okay.  Start again.

25            MR. LIEVENSE:  The government does intend to proceed

*U.S.A. v. Keith Collier*

1    by proffer.  Before I begin proffering facts, may we have a

2    brief sidebar?

3                THE COURT:  Certainly.

4                (Sidebar conference held off the record)

5                MR. LIEVENSE:  Your Honor, I begin by noting as set

6    forth on the detention motion worksheet that this is a

7    presumption case, both on -- with respect to that no

8    conditions will reasonably assure the safety of any other

9    person in the community under 18 U.S.C. 3142(f)(1)(C), and

10   also a rebuttable presumption that no conditions will

11   reasonably assure the appearance as required, as well as the

12   safety of the community, under 18 U.S.C. 3142(e)(3) under

13   subparts (A) and (B).

14               I proffer the pretrial services report as well as

15   the addendum.  Also the indictment.  The criminal complaint

16   in this matter is on the docket.  It's in case 15-30495.

17               And also I've provided to the Court five exhibits

18   which I will refer to during my presentation.

19               Exhibits One and Three are rather voluminous.  I

20   plan on summarizing them briefly.  But I provided them so

21   that the Court -- if the Court would like to read in more

22   detail, they are in sum the returns, the reports written

23   after search warrant executions, and they provide more

24   details than I intend to go into today unless asked.

25               I think it's important before going to the search

*U.S.A. v. Keith Collier*

1   warrant executions to understand a little bit of the

2   background of this investigation.  For over two years, DEA

3   agents have been working with cooperating sources and

4   identified a person known as Jack who was a known close

5   associate of a high-level person in charge of a drug

6   trafficking organization in the Detroit area.

7           By showing photographs of individuals, multiple

8   sources confirmed that that photograph showed a picture of

9   Jack and that photograph was of Mr. Collier himself.  So DEA

10  was able to confirm, again, Mr. Collier's name, as well as

11  his nickname of Jack.

12          In April of this year, under the direction of the

13  DEA agents, another source was able to purchase a

14  distribution amount of heroin from Mr. Collier through a

15  third party.

16          THE COURT:  What's a distribution amount?

17          MR. LIEVENSE:  One moment.  Approximately an ounce.

18          THE COURT:  Okay.

19          MR. LIEVENSE:  Agents performing surveillance, and

20  they had been doing surveillance on Mr. Collier for a while,

21  during this transaction saw him leave a residence on Summit

22  Drive in Farmington Hills, and drive a blue Cadillac that had

23  been registered to him that they had been following and

24  monitoring, and knew it was associated with Mr. Collier.

25          They saw him drive to an address on Montana Street

8

*U.S.A. v. Keith Collier*

1    in Detroit.  Surveillance on the third party also was going

2    on and saw that third party meet with Mr. Collier at the

3    location on Montana.

4         The results of this surveillance and transaction

5    were that the source, through that third party and through

6    surveillance, they were able to see, observe Mr. Collier

7    engage in a drug transaction with that third party who then

8    provided the proceeds to the source.

9         Later on in April, agents continued surveillance of

10   both the Farmington Hills address and the Montana address.

11   Excuse me.  The Montana address is in Detroit.  There's an

12   address in Farmington Hills on Summit Drive.  And observed

13   him, Mr. Collier, leaving the Summit Drive address, go to a

14   laundromat, park for a period of time and then drive to the

15   Montana Street address, which is a common tactic used to see

16   whether law enforcement is following an individual customer,

17   or indeed, the person himself.

18        During these observations, law enforcement observed

19   Mr. Collier interacting with another individual at the

20   address on Montana Street which gave an indication that Mr.

21   Collier and that other person were also engaged in a drug

22   trafficking negotiation, a drug sale.

23        Later in April, on April 28th, DEA agents secured a

24   search warrant authorizing a GPS tracker on Mr. Collier's

25   Cadillac.

*U.S.A. v. Keith Collier*

1    A review of electronic surveillance showed that

2    Collier's vehicle was commonly at the Montana address in

3    Detroit, as well as the Summit Drive address in Farmington

4    Hills.  And based on the times of the visits, it appeared

5    that Mr. Collier was living at the Summit Drive address in

6    Farmington Hills and that the Montana address was more of a

7    stash house, which was also consistent with prior

8    surveillance of that address and what Mr. Collier had gone to

9    that address to do previously.

10    They also investigated Mr. Collier's employment

11    history.  And as consistent with pretrial services' report,

12    found that he was -- did not appear to earn legitimate

13    income.

14    Based on the information in their investigation,

15    then fast forwarding to May 20th of 2015, DEA agents secured

16    search warrants of both addresses, the Summit Avenue address

17    in Farmington Hills and the Montana Street address in

18    Detroit.

19    During -- Exhibit One is the report based on the

20    execution of the Summit address in Farmington Hills where Mr.

21    Collier was not home.

22    Let me step back.  Exhibit Two are a couple of

23    photographs that were taken during the execution of that

24    search warrant.  During the search warrant execution, no one

25    was home, however, a Smith & Wesson MP .40 caliber handgun

*U.S.A. v. Keith Collier*

1    was found in a men's closet, a Glock 21 .45 caliber handgun

2    was found also in the master bedroom men's closet near men's

3    clothing and products.

4            THE COURT:  This is on Summit, right?

5            MR. LIEVENSE:  Correct.  And it's also noteworthy

6    that there was another closet that appeared to be for women's

7    clothing.

8            Also found at Summit was a Gucci bag under the bed

9    in the master bedroom containing $199,900, as well as one

10   counterfeit bill, so it -- as though it had been stored as a

11   full $200,000.

12           In the closet was a brown paper bag containing

13   $19,800.

14           And in the nightstand was approximately $5200.

15           The photographs provided to the Court are City of

16   Detroit water bill for 202 West Montana, which further links

17   that Summit address with the Montana address.  And also mail

18   addressed to Collier at that address on Summit in Farmington

19   Hills that were -- those two pictures were found.

20           Agents then proceeded to the Montana address in

21   Detroit.  I'm not going to list -- once there, they executed

22   that search warrant and found that the residence had kind of

23   been split into two sections; a first floor and a second

24   floor.

25           There were, in short, drugs strewn throughout the

*U.S.A. v. Keith Collier*

1    second floor of the home.  There was some drugs found on the

2    first floor as well.

3            The search warrant report, Exhibit Three, identifies

4    the approximate quantities of heroin and cocaine found on the

5    second floor, as well as the first floor.

6            THE COURT:  Where can I find that?

7            MR. LIEVENSE:  It's in Exhibit Three.

8            THE COURT:  On page --

9            MR. LIEVENSE:  Starting on page two, it shows

10   Exhibit Six.  It's described as 744.5 gross grams of

11   off-white powder substance, suspected heroin.  And then

12   continues on there in paragraph six, seven, eight, nine, ten.

13   Onto page three, through paragraph seventeen.

14           THE COURT:  Seventeen.

15           MR. LIEVENSE:  What I intended to provide to the

16   Court is based -- this was back in May.  Lab reports are in

17   on the heroin and there is more than 800 grams based on the

18   lab reports.

19           The amount of cocaine is not conclusive yet, but

20   it's approximately 500 grams of cocaine, but the final lab

21   reports are not in.

22           THE COURT:  Eight hundred grams did you say?

23           MR. LIEVENSE:  Eight hundred grams of heroin.  And

24   approximately 500 grams of cocaine, but the final lab results

25   are not in.

*U.S.A. v. Keith Collier*

1          There are -- Exhibit Four are some photographs from

2     the search warrant execution of the Montana address, which I

3     think also illustrates better than my comments as well as --

4     or the paragraphs in Exhibit Three.  The appearance of the

5     drugs, where they were found, and particularly on page four,

6     which is a block wrapped in blue tape that says "Pedro" on

7     it, of heroin, a large -- a large quantity.

8          Page five also includes packaging materials found at

9     that address.

10          Page six includes masks and other -- rubber gloves,

11     latex gloves.

12          On the second to the last page, page seven, is

13     indeed a greeting card addressed to "Jack."  As I referenced

14     earlier, that's Mr. Collier's known nickname.

15          And finally, on the last page is a photograph of a

16     gun that was recovered.  In addition to the drugs, there were

17     -- there was a loaded Para Ordnance P-10 .45 caliber handgun.

18          I would also note that that greeting card addressed

19     to "Jack" was in the kitchen cabinet beneath approximately

20     670 grams of heroin.

21          Also during the search, agents recovered evidence

22     suggesting that another person may have been living in the

23     first floor.  They interviewed that individual who reported

24     that he would pay rent to one individual, and then pay his

25     utilities to the person he knew of as Jack, that he had

*U.S.A. v. Keith Collier*

1    recently moved in.  And that he lived on the first floor, but

2    Jack occupied the second floor.

3            But Jack had access to the whole residence, that

4    Jack would have friends over, but they would only use the

5    back entrance and stairs and typically remained on the second

6    floor.  He confirmed that Jack drives a blue Cadillac.

7            And this interview occurred in June.  He reported

8    that he hadn't seen Jack since the May 22nd search warrant

9    execution.  And this individual was shown a photograph of Mr.

10   Collier and confirmed that it was the person he knew of as

11   Jack.

12           Also noteworthy is that agents conducted some

13   followup investigation regarding the items.  They submitted

14   -- they used gloves and masks to the Michigan State Police

15   for DNA testing.  In October 2nd of this year, they confirmed

16   that DNA on one of the items was from Mr. Collier.

17           Since May, at the execution of the search warrant,

18   not only were agents investigating the items recovered from

19   the scene, but they were also trying to locate Mr. Collier.

20   But they were unable to find him.

21           As indicated, Mr. Collier didn't come around those

22   addresses anymore.  Word around town was that he had been on

23   the run.  Agents waited, figuring maybe he would come back,

24   but that was not successful.

25           They were awaiting DNA results.  Eventually, on

*U.S.A. v. Keith Collier*

1    October 22nd, just a couple weeks after receiving the DNA

2    results, a criminal complaint was filed in this case.  They

3    tried -- agents tried unsuccessfully to find and execute the

4    arrest warrant on Mr. Collier.

5         I think it's noteworthy, the blue Cadillac, that

6    when they would go to the Summit Drive address, the blue

7    Cadillac was still there, but over these many months, it

8    didn't move.  Agents would go that address, and it was not

9    moving, further confirming the agents' reports that they had

10   received that Mr. Collier had fled the region.

11        After the criminal complaint was filed, they learned

12   that Mr. Collier may have -- well, at some point they learned

13   that Mr. Collier may have fled to Atlanta.  In early

14   November, DEA agents referred this case to the Detroit

15   fugitive apprehension team who then sought marshal

16   assistance.

17        The last exhibit, Exhibit Five, is a report from the

18   marshals summarizing the events of November 19th to November

19   20th, which was the apprehension of Mr. Collier in Smyrna,

20   Georgia, which is a suburb of Atlanta.

21        They note that surveillance -- they began

22   surveillance on a location, confirmed that Mr. Collier was at

23   that location based on comparing people they saw -- a person

24   they saw that -- outside the address, as well as photographs.

25        Eventually, they went to -- when they saw two men

*U.S.A. v. Keith Collier*

1    and two women in a vehicle drive to that address, one of whom

2    they saw as Collier, they went -- knocked and announced their

3    presence -- well, they waited for people to return, drove

4    into the garage, the garage closed, so they knew the people

5    were in the residence.

6         Eight marshals then knocked and announced at the

7    door.  No one responded to the door.  They breached the door,

8    but marshals stayed outside.  They yelled and ordered people

9    to leave.  At that point, one man and two women came out,

10   while apparently Mr. Collier remained hidden in the basement.

11        Eventually, after numerous attempts to get Mr. -- my

12   understanding is only verbal attempts, yelling, Mr. Collier

13   did eventually come out.

14        I would note that pretrial -- and then obviously Mr.

15   Collier made his initial appearance in Atlanta in this case

16   before being brought up to Detroit.

17        I would note from the pretrial services' report

18   that, indeed, Mr. Collier reports no income or a job since

19   2013.  That, as mentioned, more than $100,000 was found in

20   his apartment.  I'll note from pretrial services' report,

21   that Mr. Collier has been known to use at least three

22   aliases.  He also has a passport.

23        I would also quickly note from Mr. Collier's

24   criminal history, two things.

25        One is he was sentenced to ten years imprisonment --

*U.S.A. v. Keith Collier*

1    he has a significant criminal history regarding drugs, as

2    well as guns, dating back to 1988.  The most significant

3    event being the 1988 arrest and eventual conviction for

4    distribution of cocaine, for which he was sentenced to ten

5    years imprisonment on March 24, 2000 in this court.

6         Most recently, he was convicted and sentenced in

7    September of 2014 for operating while intoxicated, for which

8    Mr. Collier received 21 months probation and a suspended

9    sentence.

10        What's noteworthy about that is not so much its

11   severity, but that he was on probation while Mr. -- Mr.

12   Collier was on probation when he committed the crimes as set

13   forth in the indictment.

14        And following the May 22nd search warrant execution,

15   on June 2nd, 2015, Mr. Collier stopped reporting.  He was an

16   absconder from probation, which led to a bench warrant being

17   issued as set forth in pretrial services' report.

18        Also on July 3rd, there's a bench warrant for Mr.

19   Collier's failure to appeal -- to appear.  He was on

20   absconder status.  Obviously, the importance of this is not

21   only that he committed these crimes while on supervision, but

22   also that this further reinforces what the DEA agents learned

23   regarding Mr. Collier's flight from this district.

24        Not only was he found in Atlanta, but soon after the

25   search warrants were executed, he stopped reporting to his

1    probation officer as required, which led to these two bench

2    warrants being issued.

3           Mr. Collier clearly has a history of not complying

4    with court supervision, and given the circumstances of Mr.

5    Collier's flight, absconder status, fugitive status in

6    necessitating the marshals' involvement in getting him from

7    Atlanta.

8           For all those reasons, that reinforces -- even if

9    this weren't a presumption case, this would be a case where

10   the government would have strong evidence supporting its

11   argument that Mr. Collier presents a danger to the community

12   and that he should be detained for that reason.  And also

13   that he is a risk of nonappearance at court proceedings in

14   this case.

15          THE COURT:  Okay.  Just -- I'm sorry.  I just want

16   to just make sure I understand.

17          In terms of the two active warrants, do those arise

18   out of the same criminal action?

19          MR. LIEVENSE:  It's not clear to me from the report

20   whether they are both a function of him not being out of

21   absconder status.

22          The first one was a bench warrant for absconding.

23   The second was a bench warrant for failure to appear.

24          It's possible that after he did not report in

25   response to one bench warrant, that he was scheduled for a

*U.S.A. v. Keith Collier*

1    court appearance to which he, again, did not appear.

2            THE COURT:  Is Probation Officer Helms here?

3            MR. HILLIER:  No, Your Honor.  Marcus Hillier on

4    behalf of pretrial services.

5            And actually, it appears that there are three

6    warrants.

7            THE COURT:  Three?

8            MR. HILLIER:  Yes.  On page two of the addendum in

9    bold print, it states that an arrest warrant was issued for

10   being in an absconder status from Farmington Hills.  You come

11   down --

12           THE COURT:  That's -- isn't that the June 2nd?

13           MR. HILLIER:  Okay.  Right, You're right.  So that's

14   the June 2nd warrant.

15           THE COURT:  Okay.

16           MR. HILLIER:  The prior warrant is dated July 30th,

17   arises out of the 50th District Court in Pontiac.

18           THE COURT:  That's a different court.

19           MR. HILLIER:  Different warrants, so --

20           THE COURT:  The two different warrants.

21           MR. HILLIER:  So there are two different warrants at

22   this time.

23           MR. LIEVENSE:  I believe I misspoke and said July

24   3rd when it should have been 30th, previously.

25           THE COURT:  Okay.  Are you done with your proffer?

19

*U.S.A. v. Keith Collier*

1        MR. LIEVENSE:  Yes.

2        THE COURT:  Mr. Jackson, do you have any proffer?

3    I'll take argument later, but do you have any proffer?

4        MR. JOHNSON:  Yes, Judge.

5        Yes, Your Honor.  First, just to answer the Court's

6    question, those two violations that you questioned were out

7    of two separate W -- I mean OWIs.

8        THE COURT:  Okay.

9        MR. JOHNSON:  So for your knowledge.

10       Judge, I would indicate that clearly this is a

11   presumption case.  And I would argue though, that there are

12   --

13       THE COURT:  Like I said, I'm just asking right now

14   for proffers and not argument.

15       MR. JOHNSON:  Well, I would indicate to the Court

16   that his history reflects appearance and not -- and no

17   dangerousness to the community, okay.

18       His prior drug offenses dating back to 1988, if you

19   look at the --

20       THE COURT:  I'm asking, do you have anything to

21   proffer?

22       For example, you heard the prior detention hearing

23   that the defense attorney proffered the availability of a

24   third party custodian, evidence that you would proffer, and

25   then I'll take argument -- afterwards.

*U.S.A. v. Keith Collier*

1          MR. JOHNSON:  Okay.

2          THE COURT:  -- afterwards.

3          MR. JOHNSON:  Okay.  Judge, yes.  I do have his

4    mother and his fiancee here that would satisfy third-party

5    custodian if the Court were to consider that.

6          I would indicate that there's -- his mother and his

7    fiancee live in two separate residences.  There's no prior

8    criminal records.  I've spoken to both of them, and they

9    would act as third-party custodians in this matter.

10          I would also indicate that he has lifetime

11   residency, that he doesn't pose any threat to any witnesses,

12   that there is no potential for any ongoing criminal activity,

13   no potential for him to be in possession of any firearms.

14          I would indicate to the Court that he has strong

15   community ties.  He's been here all of his life.  He has a

16   residence here.  He has a son here that he cares for, that

17   the mother of that child is also present in court.

18          That -- and Judge, based on those reasons, I don't

19   believe he is a flight risk.  And I leave the rest for

20   argument.

21          THE COURT:  Okay.  Mr. Lievense, argument?

22          MR. LIEVENSE:  Your Honor, as indicated at the

23   close, I guess I probably shifted over to argument at the end

24   of my factual proffer, that even if this weren't a

25   presumption case, the government has strong evidence

*U.S.A. v. Keith Collier*

1    supporting detention in this case under the factors set forth

2    in 18 U.S.C. 3142(g), and that there are no conditions that

3    could be set by the Court to assure the defendant's

4    appearance and the safety of the community or any person of

5    the community.

6           The nature and circumstances of the offense here,

7    you know, this is a crime of violence.  It's a drug

8    trafficking crime.  There are serious charges that come with

9    very serious consequences, including the charge under 924(c),

10   which as the Court indicated during the arraignment, is five

11   years in addition to any other charge.

12          The weight of the evidence at least factually I

13   think, and the reason I proffered those reports and

14   photographs, aren't obviously just the -- this factor is not

15   just weight of the evidence in the underlying case, but the

16   weight of the evidence in support of detention.

17          And I think, though, those reports and those

18   photographs go both ways -- go towards both issues, which is

19   they show that Mr. Collier, after his home and stash house

20   were hit and all of that money and all of those drugs were

21   found, he fled.

22          There's been no argument or suggestion of a tether

23   at this point, but in light of these facts, I don't see how

24   home confinement, any sort of tether, or any sort of

25   third-party custodian can account for those recent facts that

22

*U.S.A. v. Keith Collier*

1    have happened over the last six months.

2         Mr. Collier not only has family ties here, he has

3    close connections elsewhere.  He obviously found it very easy

4    to flee Detroit and found a place to go in Georgia.

5         Under -- he obviously has no employment, yet somehow

6    has significant financial resources.  Now, maybe those are

7    less than before, because the government has seized over

8    $100,000 of his money, but the government doesn't know what

9    else he may have hidden somewhere and that incongruity

10   between his employment and his financial resources further

11   supports detention in this case.

12        His past conduct -- again, the criminal convictions,

13   his criminal history is extensive.  He is absconder status,

14   including the two warrants, all counsel in favor of the

15   defense not having overcome the presumption of detention in

16   this case.  And obviously, therefore, the government does

17   concur with pretrial services' recommendation for detention.

18        THE COURT:  Thank you.

19        Mr. Johnson, your argument?

20        MR. JOHNSON:  Judge, I would indicate to the Court

21   that there are numerous (g) factors that this Court could

22   consider where there are conditions of release that will

23   reasonably assure the defendant's appearance, and the safety

24   of the community.

25        After review of those applicable factors, Judge, I

*U.S.A. v. Keith Collier*

1    would turn to his criminal history, which the government has

2    maintained reflects non-appearance, which we disagree.  And

3    dangerousness to the community, which we disagree.

4         His prior drug offenses, which are limited and are

5    remote in nature, I would indicate to the Court back to the

6    time where he was -- at 14 years of age, I would indicate to

7    the Court his prior drug offenses dating back to 1988, he was

8    18 years of age, involved two packs of heroin, no weapons,

9    consistent with possession.  No violence.

10        And he was sentenced to one to four, and he accepted

11   responsibility.  No capias history at that time.  No

12   absconding history.  And he complied otherwise in that

13   matter.

14        In 1990, Judge, we see a CCW, one CCW, carrying in a

15   motor vehicle, not associated with any drug activity

16   whatsoever or any other criminal activity at the time.  Mere

17   possession.  He served two years probation on that matter.

18   At the age of 20.  I would indicate my client is in his

19   mid-upper forties now.

20        Then he has that period of time, Judge, from the age

21   of twenty on, that he has some larcenies related to

22   situations that are really -- I'm not going to take up the

23   time of the Court, but really clearly nonsensical, being in a

24   place where he wasn't supposed to be.  Somebody used a false

25   credit card, things of that sort.  But nothing associated to

24

*U.S.A. v. Keith Collier*

1    dangerous criminal activity.  No firearms, no drugs.

2         And then we move on, Judge, to his first major drug

3    trafficking conviction, which was in August of 1998.  That's

4    significant, Judge.  And I would indicate to the Court that

5    that involved no major drug trafficking at that time.

6         There was no ongoing criminal activity that was

7    shown in the -- what eventually became a one-count indictment

8    arising out of a hand-to-hand sale to a DEA agent after he

9    was requested to facilitate a sale of three ounces of crack

10   cocaine, of course, to a third party.

11        No firearms involved, no major drug trafficking or

12   evidence of any other underlying facts as the government has

13   noted in this case to suggest that he was involved in a real

14   drug trafficking situation.

15        However, he served 120 months under Count One, which

16   is still considered drug trafficking in the indictment.  I

17   suggest to the Court there was nothing significant with

18   respect to firearms or anything of that sort to suggest that

19   he was using firearms.

20        No homicides, nothing of that nature to indicate

21   that he was a danger to the community as this Court knows,

22   has seen many cases which does involve homicides and things

23   of that sort.

24        THE COURT:  But at the same time, I don't really

25   have any of that information in front of me.

*U.S.A. v. Keith Collier*

1          MR. JOHNSON:  I understand, Judge.

2          Then we get to -- as far as his criminal history,

3      then I would like to talk about his character, and good

4      character under the (g) factors.  He did 120 months under the

5      mandatory minimum sentence, and was released on a four-year

6      supervised release.

7          THE COURT:  This says five years.

8          MR. JOHNSON:  Five years supervised release, Judge.

9          THE COURT:  And when was he released from supervised

10    release?

11         MR. JOHNSON:  In --

12         THE COURT:  I was calculating perhaps 2013.

13         Do you know Mr. Lievense, when he was released from

14    supervised release?

15         MR. LIEVENSE:  My understanding is that he was

16    discharged early, but I --

17         THE COURT:  Okay.

18         MR. JOHNSON:  Two thousand -- go ahead.

19         MR. LIEVENSE:  Okay.  But I don't know that.

20         MR. JOHNSON:  Yeah, Judge, my point is that he

21    complied --

22         THE COURT:  Mr. Johnson, do you know when he was

23    discharged from supervised release?

24         MR. HILLIER:  Yes, 2009, after two years.

25         MR. JOHNSON:  Two thousand -- after two years,

*U.S.A. v. Keith Collier*

1    Judge.  He was sentenced to four or five, as this Court shows

2    five years of supervised release, and he was released early,

3    Judge, because he complied with everything that was required

4    of him.  No violations.

5            He worked with the six years for the Salvation Army

6    as a truck driver, no problems.  He became a manager, was

7    released from supervised release because of his conduct after

8    two years.

9            And addressing the absconding and the potential for

10   absconding, I believe he's grown at the age of 45.  He

11   recognizes the seriousness of the offenses in this

12   indictment.

13           However, Judge, there are some questions that

14   surround possibly the search warrants in this case.  We leave

15   that to the District Court Judge.

16           There are some questions about the 924(c) and the

17   firearms that were found in the two raids.  We understand the

18   seriousness of those charges, and the proffer that was made

19   and the underlying amount in weight of the drugs in that

20   case.

21           However, with respect to the firearms, which is part

22   of what makes this a presumption case, there could be some

23   questions of whether, pursuant to *U.S. v. Bailey,* those

24   firearms were passive possession.

25           But moving on from that, he was picked up in Atlanta

27

 1     after being there only 14 hours.  And based on the discovery

 2     that I received just moments before we came into this

 3     proceeding, it appears to me from the conduct of the agents

 4     and from the slight history that the government has laid out

 5     with respect to the surveillance and what led up to these

 6     arrests, it appears that -- I would make note that he had no

 7     knowledge of the warrants or the complaint or when the

 8     complaint was issued in this case and --

 9            THE COURT:  Are you saying he wasn't aware that the

10     house -- that this house on Summit and the house on Montana

11     were searched?

12            MR. JOHNSON:  Clearly, he was aware of that, Judge,

13     but as this Court knows, in many cases raids do take place

14     and charges are not brought until a year or so later.

15            But I think what's important to note is that he

16     never had notice of the fact that he was wanted on any

17     complaint.  The complaint was sealed in this case for a long

18     time.

19            So based on his proffer, it appears that the agents

20     were so concerned about surveillance, at no point, did they

21     go up, knock on the door, leave a card, or leave notice with

22     his family members or anyone to suggest that he was wanted on

23     any outstanding warrant.

24            And I think you have to talk about knowledge and any

25     conduct that there was no -- of course, I would suggest to

1    the Court there was fear from those two raids, obviously, but

2    that doesn't -- you can't infer from that that he was

3    intending to abscond.

4            THE COURT:  No.  I am inferring that he intended to

5    abscond based upon the fact that he absconded --

6            MR. JOHNSON:  Well, I was --

7            THE COURT:  -- from probation.  So -- I mean, that

8    is the inference I draw from the fact that he absconded from

9    his probation.

10           MR. JOHNSON:  Judge, well, I would indicate to the

11   Court if you look under the underlying facts to the

12   probation, he never had a violation until that time at the

13   raids.

14           And this Court knows with the seriousness of these

15   charges, it's common amongst defendants to be fearful.  It's

16   common that they don't want to turn themselves in until they

17   know that something, --

18           THE COURT:  Of course.

19           MR. JOHNSON:  -- of course, is pending.  He sought

20   -- he sought representation.  And I would indicate to the

21   Court that he also sought representation from the

22   out-of-state counsel.  And counsel gave him bad advice.

23           And he was referred to that counsel, and I won't

24   mention any names, but he was given bad advice, and he was

25   seeking to determine whether or not there was anything that

1    was outstanding.

2         He was told that they would contact the United

3    States Attorney.  He was advised that they would try to deal

4    with it on a pre-indictment status.  That was not -- he gave

5    -- he got bad advice and that was not true.

6         I have not -- I'm not minimizing his conduct, but to

7    infer -- and I would like to suggest we look at the report,

8    where they were surveilling him --

9         THE COURT:  Which report are you referring to?

10         MR. JOHNSON:  Where they talk about the surveillance

11    from Detroit, when they drove to Atlanta, where he was

12    arrested.

13         He was in Atlanta for 14 hours.  They surveilled

14    him.  At no time does has his family or anybody else been

15    informed that there is a sealed complaint, or that he's

16    wanted on a warrant.

17         THE COURT:  Why would they tell the family that

18    there is a sealed complaint.  I don't even know that they can

19    tell the family that there is a sealed complaint.

20         MR. JOHNSON:  Not that they would tell them that

21    it's a sealed complaint, but that they would tell them that

22    he is being looked for, because they know there may be a

23    warrant. Judge, he has to have notice before we can say he

24    evaded arrest.

25         So I'm going to move on.  But what I'm suggesting in

30

*U.S.A. v. Keith Collier*

1    this report is that the agents are looking for additional

2    criminal activity.  They think he's in Atlanta trying to

3    maybe do a deal or something.  But if you look at this

4    report, none of the parties that he was --

5            THE COURT:  Where are you getting that from?

6            MR. JOHNSON:  From the exhibit -- what exhibit is

7    this?

8            THE COURT:  Where does it say that they think he's

9    involved in other activities?

10           MR. JOHNSON:  Judge, you have to assume if they're

11   surveilling him --

12           THE COURT:  Well, I don't want to assume.  I'm

13   saying if --

14           MR. JOHNSON:  Well, the way they came into this

15   residence and searched everybody and looked at everybody as

16   though they were committing or involved in some criminal

17   activity, there wasn't any criminal activity.  None of these

18   persons have warrants on them.  To suggest that they went

19   down in the basement and beckoned him two or three times,

20   there's no evidence of that.

21           What it does say is that he was asked to come out,

22   he came out.  He complied.  There were no firearms found on

23   his possession.  He was not involved in any new criminal

24   activity.

25           And it's just as reasonable to conclude that he was

31

1    there visiting or whatever he was doing.  But to say that he

2    -- he has a passport.  There is no evidence that he tried to

3    leave the country.  There is no evidence that he was in other

4    parts of the country.

5         So I'm suggesting to the Court that that should not

6    be deemed a factor in suggesting that he was absconding.

7         And moving on, Judge, and I'm going to wind it up.

8         Judge it's interesting to note that in the --

9    there's an addendum that in the initial -- in the initial

10    arrest, an arraignment on the complaint in Atlanta, the

11    Northern District, pretrial services did an investigation and

12    recommended release.

13         And it wasn't -- and I was in contact with the U.S.

14    Attorney at that time through the federal defender at that

15    time, and we, in fact, consented to detention and to have the

16    detention hearing held up here.

17         He was under the impression that he had counsel down

18    there at that time, which we found out he was not counsel,

19    and he was not licensed to practice in that state or this

20    state.

21         However, they recommended release.  With this

22    addendum, the only thing that they find here in this

23    jurisdiction pretrial services is the two misdemeanors, OWI.

24         We believe, and I suggest to this Court, that that

25    shouldn't take precedence over a federal indictment.

*U.S.A. v. Keith Collier*

1    Clearly, we agree that there is probable cause through the

2    indictment and the complaint, but to suggest that he was

3    absconding from the two misdemeanors is just not proper,

4    Judge.  He has an alcohol addiction.  He had not been

5    drinking up until the time of those raids.  When those raids

6    took place, he fell off, it was out of fear.

7              It's just as reasonable to conclude he didn't want

8    to appear for a number of reasons.  To suggest he was

9    absconding on those two offenses, I just don't see it, Judge,

10   because he was in compliance up until the time of the raids.

11             He should not be considered an absconder on those

12   two misdemeanors.

13             Other than -- other than the seriousness of the

14   offenses that we have, we believe that the -- even though

15   this is a presumption case, that the government has not met

16   its burden by clear and convincing evidence that this

17   gentleman is a danger to the community.

18             And we believe that the Court could design

19   conditions that would reasonably assure his appearance as

20   well as the safety of the community.  There is no threat to

21   potential witnesses as I indicated.  And no history -- no

22   history of violent behavior.  No history of any violent

23   crimes.

24             Judge, if he had been a -- hypothetically, if he had

25   been released in the Northern District, then we wouldn't be

1      here today.  We would be here maybe on a motion to revoke.

2      But this Court probably would not revoke if he had complied

3      up and from the time of that arraignment until now.

4            So I'm suggesting to the Court that but for the

5      seriousness of this -- of these offenses, and this Court has

6      seen this kind of weight, this Court has seen these kind of

7      charges, and if you look at this criminal history and what

8      has taken place over the last several years, and take out the

9      remoteness of some of this -- of this criminal history, I

10     think, Judge, he is a candidate and a person that would

11     appear.  I've known him --

12           THE COURT:  Mr. Johnson, you said that you're

13     wrapping up and you keep --

14           MR. JOHNSON:  I know, Judge.

15           THE COURT:  You're rewinding up.  And really, this

16     has been going on for a while, so I do need you to wrap up.

17           MR. JOHNSON:  I'm through.

18           THE COURT:  Okay.  Thank you.

19           Mr. Lievense, any response?

20           MR. LIEVENSE:  Just briefly.

21           Regarding this knowledge that Mr. Johnson talks

22     about for Mr. Collier, he did know of the raids.

23           He suggests law enforcement should have done

24     something different than just contacting additional people.

25     Law enforcement was waiting for Mr. Collier's head to pop up.

*U.S.A. v. Keith Collier*

1    Talking to more people would force him to go further

2    underground.

3           The other knowledge that Mr. Collier unquestionably

4    had was that he was on probation.  So setting aside whether

5    he had knowledge of a criminal complaint or the raids, he

6    knew he was on probation and became -- and absconded from

7    that probation.

8           I'll end there.

9           THE COURT:  All right.  This is, as has been

10   indicated, a presumption case.  It's a presumption case in a

11   variety of ways.

12          One, based upon the fact that Mr. Collier was on

13   probation at the time that he's alleged to have committed the

14   crimes at issue here, and because it's a drug trafficking

15   crime with a maximum prison term of ten years or more, and

16   because it's a 924(c), there's a 924(c) count, and that's

17   unusual that there's a presumption because of so many

18   different factors.

19          And really, I do believe -- well, I will say that

20   that means the burden of production is on the defense, and

21   the burden is not heavy.

22          Nevertheless, the Court, even if the defendant

23   presents evidence to overcome the burden -- or the

24   presumption, the Court is still supposed to factor in that

25   this is a presumption case.  I don't believe that Mr. Collier

*U.S.A. v. Keith Collier*

1   continues to be -- I believe that there are conditions that

2   would address his danger to the community.

3          However, not his flight risk.  And truly, Mr.

4   Collier, if after the searches of the home, you hadn't gone

5   to Atlanta and as a result violated -- absconded from

6   probation and failed to appear for the DUI, then I would be

7   satisfied with a tether.

8          However, because of that flight and absconding, it

9   is absconding from probation.  I mean, there is no other way

10   to describe it.  He absconded from probation and then failed

11   to appear in a completely separate case.

12          I do believe that the facts of this case indicate

13   that he fled to Atlanta because of the fact that he

14   understood that he would be facing a significant amount of

15   prison time after the drugs and firearms were found, and

16   regardless of whether there's enough evidence to show that

17   the possession of the firearm was in furtherance of drug

18   trafficking.

19          I do believe there's probable cause and that's all

20   the burden is here.  And really, that's not even something

21   for me to evaluate, because the grand jury has indicted Mr.

22   Collier on those charges, and so he is -- has already been

23   found to -- or there has already been found evidence of

24   probable cause.

25          So not withstanding that, I'm sure that Mr. Collier

*U.S.A. v. Keith Collier*

1    anticipated that the guns and the drugs in combination were

2    going to expose him to a lengthy prison sentence.

3         Here we're talking about possession with intent to

4    -- two counts of possession with intent to distribute

5    controlled substances which have five-year minimums, plus a

6    924(c) count, which is a consecutive five years.  So we're

7    looking at a likelihood of at least ten years or more.

8         And so I think that the fear that Mr. Johnson

9    addressed is still there, and that because of this flight,

10   this very recent flight and absconding from probation, I find

11   that Mr. Collier has not overcome the presumption.

12        I'll lastly note that Mr. Johnson pointed out how

13   long ago some of these convictions were, and that's true.

14   That's because Mr. Collier spent ten years in prison on the

15   1998 charge and the -- the time period at which he completed

16   his supervised release is not remote.  So a lot of these

17   convictions are remote and I don't think that they hold a lot

18   of weight.

19        But the 1998 conviction I don't think of as remote,

20   because he just completed his sentence some years ago.  And

21   the fact that he completed his sentence and supervised

22   release without any violations would have indicated to me

23   that he should be allowed to remain in the community pending

24   trial, if it weren't for the fact that he fled and absconded

25   from probation, and also failed to appear for the second --

*U.S.A. v. Keith Collier*

1    for that other DUI charge.

2            Under those circumstances, I just cannot find that

3    Mr. Collier has overcome the presumption that he's a flight

4    risk.

5            MR. JOHNSON:  Judge, if I may, I just --

6            THE COURT:  No, you may not.  That is my ruling.

7            So I will order Mr. Collier detained pending trial.

8    This case is assigned to Judge O'Meara and he'll schedule all

9    future dates.

10           MR. LIEVENSE:  Thank you, Your Honor.  Nothing

11   further from the government.

12           THE COURT:  Anything further, Mr. Johnson?

13           MR. JOHNSON:  Nothing further, Your Honor.

14           Thank you.

15           THE COURT:  Thank you.

16           (Court in recess at 2:39 p.m.)

17                    *      *      *

18

19

20

21

22

23

24

25

*U.S.A. v. Keith Collier*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17                        **C E R T I F I C A T I O N**

18          I, Marie J. Metcalf, Official Court Reporter for the

19    United States District Court, Eastern District of Michigan,

20    Southern Division, do hereby certify that the foregoing is a

21    correct transcript of the digital sound recording of the

22    proceedings in the above-entitled matter and has been

23    prepared by me or under my direction.

24    s\Marie J. Metcalf                          02-09-16

25    Marie J. Metcalf, CVR, CM                   (Date)